J. Robert Lynch, J.
This is a proceeding to review the petitioners ’ real property tax assessments by the respondent towns for the year 1969.
The petitioner Metropolitan Water Board is the administrative body of the petitioner Onondaga County Water District. The latter was established pursuant to article 5-A of the County Law to develop Lake Ontario as a water supply. Those of its facilities which lie outside of its district are taxable. (Matter of Onondaga County Water Dist. v. Board of Assessors, 55 Misc 2d 481, affd. 30 A D 2d 643, mot. for lv. to app. den. 22 N Y 2d 645.) Consequently, its water pipeline, as it traverses Oswego County, has been taxed by the respondent towns.
Bach respondent set for the assessed value of its part of the pipeline what it deemed to be its cost of construction, using cost estimates supplied by the petitioners. It is the petitioners’ contention that the assessment should be determined by capitalization of the pipeline’s current net income. Behind this contention lies the fact that while the pipeline was designed in anticipation of water needs three and four decades from now its present use is but 25% of its capacity.
The facts are not in dispute. (There is some disagreement over the propriety of including certain figures as costs, but this is a secondary issue.) The pipeline is new; 1969 is the second full year of its operation. The footage in each town is definitely ascertained. Its cost is known. The pipeline was financed by general obligation bonds of Onondaga County maturing in 30 years; it has a period of probable usefulness of 40 years. None of the income from the pipeline is used to pay *799 off the principal of the bonds; this is done from the county’s general tax revenue. Any excess of income over expenditures must be used for improvements or to reduce the price of water to the consumer. This financing was considered by the petitioners sufficient to make the cost of the project economically feasible.
There are other pertinent facts. The petitioners’ pricing of water must be competitive with other suppliers. Anticipated water requirements and the 10-year lead time necessary for their fulfillment have already forced the petitioners to look past the time when the present line will be used to capacity and to plan additional facilities. However in 1969 the usage was approximately 25% of average capacity and the income in excess of expenditures that that usage generated has been determined.
Real property must be assessed at full value (Real Property Tax Law, § 306); this has been held synonymous with market value (People ex rel. Parhlin Operating Corp. v. Miller, 287 N. Y. 126; Matter of Queensbury Hotel Corp. v. Board of Assessors of City of Glens Falls, 33 Misc 2d 302). In determining market value “ every element which can reasonably affect the value of property ” ought to be considered. (Matter of Rakov v. Gingold, 23 Misc 2d 725, 729.) “ In the main, consideration should be
given to actual sales of the subject or similar property, the cost to produce or reproduce the property, the capitalization of the income therefrom, or to a combination of these or other relevant factors ” (58 N. Y. Jur., Taxation, § 160). It is presumed that the assessment is valid and the petitioners carry the burden of proving its invalidity (People ex rel. Jamaica Water Supply Co. v. State Bd. of Tax Comrs., 196 N. Y. 39).
We cannot accept the petitioners’ contention that capitalization of their current income gives a true market value. The use of the capitalization theory must indulge in the hypothesis that the property is an investment productive of a return, either actual or potential (People ex rel. Ogdensburgh & Lake Champlain R. R. Co. v. Pond, 13 Abb. N. C. 1). “ The theory is that the present value of any object of wealth is simply a discounted or capitalized valuation of the anticipated services derivable by the owner of this wealth.” (1 Bonbright, Valuation of Property 218). The net income figures here cannot be deemed equivalent to an investment return because the management which generated them was under no obligation to produce any income in excess of expenses except as it desired to make improvements or to reduce the price of water. Put another way, this management is charged with the duty of keeping its income in excess of expenses at zero. Thus the petitioners’ net for 1969 is not credible as a return on investment.
*800 Even were we to assume the validity of the petitioners ’ figures as indicative of what this investment would produce through usage at 25% capacity, would it not then be valid to assume that usage at full capacity would produce a considerably greater net? (There seems to be an implication by the petitioners that the assessment should increase as the percentage of use increases.) Yet the petitioners’ theory of valuation would have us consider only the present, or the past, and close our eyes to the future which promises full capacity usage by their own expectation long before the end of the period of probable usefulness. ‘1 The truth is that, when earnings have once been ‘ realized ’, so that they can be expressed with more approach to accuracy in the company’s accounts, they are already water under the mill and have no direct bearing on what the property in question is now worth. Value, under any plausible theory of capitalized earning power, is necessarily forward looking. It is an expression of the advantage that an owner of the property may expect to secure from ownership in the future. The past earnings are therefore beside the point, save as a possible index of future earnings.” (1 Bonbright, supra, p. 250).
This view finds support in the decisions where the distinction is usually drawn by saying that capitalization should be of rental value, not of rent reserved. For example, in People ex rel. Gale v. Tax Comm, of City of N. Y. (17 A D 2d 225) the court denied the efficacy of the income derived from a long-term lease as a basis for determining market value because the rental had been set in depressed times and had become unrealistically low. The words of Mr. Justice Bergax quoted therein (from People ex rel. 379 Madison Ave. v. Boyland, 281 App. Div. 588, 590) are appropriate here. ‘ ‘ Assessments cannot be made to trail behind every turn in the fortunes of real property. There are times when property must bear a share of taxation proportionate to value even though it may then have no income, or an income inadequately focused to true value.” (See, also Powell and Jacobs, Powell’s Reducing Realty Taxes [3d ed.], 91, 92, and the cases cited therein, Ettlinger v. Weil, 184 N. Y. 179, Goelet v. National Sur. Co., 249 N. Y. 287, 295 and People ex rel. Connelly v. Weise, 261 App. Div. 980; Income or rental value as a factor in valuation of real property for purposes of taxation, Ann. 96 ALR 2d 666; 58 N. Y. Jur., Taxation, § 164.)
Again, assuming the validity of the petitioners’ figures as net income, their approach to valuation confronts another -obstacle. This has been described in People ex rel. Brooklyn Gas Co. v. Chambers (7 Misc 2d 601, 603, 604) which while referring to a railroad is analogous here. ‘ ‘ When there is no question before *801 the assessors save the value of that part of the real estate of a railroad which is within the town, the cost of replacing it will ordinarily furnish a just measure of valuation. The principle of assessing a few miles of railroad in a town according to the relations which it is supposed to bear to the whole of a vast and intricate system, or to the income or earning power of the entire system, draws into the calculation so many elements that the process becomes too complex and difficult even for an expert. It is no disparagement of the capacity and intelligence of the average assessor to say that it would present to him a problem incapable of accurate solution and a rule of action in the performance of his official duty impossible in practice. The process virtually requires the assessors to assign to each mile of railroad its proportionate share of the income of the entire system and estimate the value of the real estate upon that basis ” (quoting People ex rel. Delaware, Lackawanna & Western R. R. Co. v. Clapp, 152 N. Y. 490, 495). The analogy is the more striking with the knowledge that the pipeline has valves built into it in the respondent towns awaiting tapping and water distribution in their areas.
At first glance some of the cases cited by the petitioners would seem to support their contention that market value may be determined from realized income. A close reading discloses that where current income has been utilized it is only because it is an accurate reflection of prospective income.
Accordingly we conclude that, apart from the question of the propriety of certain included costs, the petitioners have failed to maintain the burden of proving the illegality of the assessments.
In arriving at the cost of the pipeline, we find that the cost of land owned in fee by the petitioners must be excluded because it is separately assessed and is not part of this proceeding. We find that the estimated expenses should give way to the actual expenses in the absence of any claim that the latter are inflated or unreasonable.
The respondents have included in costs the petitioners ’ expenses in obtaining the easements for the pipeline. The petitioners argue for the exclusion of these expenses on the assertion that such easements are not taxable. The respondents claim that they are. We think this misses the point. The question is what are the components of the cost of the pipeline and not whether or not any component is separately taxable. The obtaining of the easements was a sine qua non of the line’s construction. Without them the line is valueless. We find these costs should be included.
*802 Such costs as site preparation, excavation, backfilling, pavement cutting and replacement, railroad crossing and the like are in the same category. While they are not a tangible part of the water system as it now exists and hence ‘ ‘ confer no value [on it] as such ” (Stamford Gas & Elec. Co. v. Town & City of Stamford, 6 Conn. Supp. 505, 531), where the approach to market value lies in assembling construction costs, they must be included.
The assessment of the respondent Town of Volney complained of is based on a market value of $2,024,900 to which an equalization rate of 25% has been applied. The actual construction cost of the facility was $2,446,457.43 ($2,454,956.43 less $8,499 for the cost of land in fee). The petition with respect to the Town of Volney must be denied.
The assessment of the respondent Town of Oswego complained of is based on a market value of $6,634,303 to which an equalization rate of 20% has been applied. The actual construction costs of the facility were $7,430,420.51 ($7,492,968.64 less $62,458.13 for the cost of land in fee). The petition with respect to the Town of Oswego must be denied.
The assessment of the respondent Town of Minetto complained of is based on a market value of $1,048,863 to which an equalization rate of 22% has been applied. The actual construction costs of the facility were $1,501,499.56. The petition with respect to the Town of Minetto must be denied.
The assessment of the respondent Town of Schroeppel complained of is based on a market value of $1,904,761 to which an equalization rate of 21% has been applied. The actual construction cost of the facility was $1,931,911.52. The petition with respect to the Town of Schroeppel must be denied.